## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**DENZIL T. MOORE,**

    **Plaintiff,**

**v.**                                               **CIVIL ACTION NO. 2:06cv71**
                                                             **(Judge Bailey)**

**FEDERAL BUREAU OF PRISONS,**
**RICHARD RAMIREZ, Regional Medical Director,**
**ELIZABETH MASTELLER,**
**DR. ELLEN MACE,**
**JANET BUNTS,**
**MARK DIB,**

    **Defendants,**

## REPORT AND RECOMMENDATION

### I. Procedural History

The *pro se* plaintiff initiated this case on July 31, 2006, by filing a civil rights complaint against the Federal Bureau of Prisons, Harrell Watts, Kim White, K.L. Wendt, and Richard Ramirez in which he alleged deliberate indifference to his medical condition known as Rhabdomyolysis. On August 15, 2006, the plaintiff was granted permission to proceed as a pauper. On October 16, 2006, the undersigned issued a Report and Recommendation which recommended: (1) The Bivens claims against the defendants in their official capacities be dismissed; (2) the claim against the BOP be dismissed because Bivens actions are only available against individual federal officials; (3) defendants Ramirez and White be dismissed for a lack of personal involvement and because respondeat superior cannot form the basis of Bivens claim; (4) defendant Wendt be dismissed for failure to state an Eighth Amendment ineffective medical treatment claim; and (5) defendant Ramirez be made to answer the

complaint as it appeared he may have been partially responsible for the plaintiff's health care at FCI Gilmer.

On October 26, 2006, the plaintiff filed timely objections to the screening Report and Recommendation. The case then remained inactive until August 24, 2007, when the plaintiff filed a motion to amend his complaint. In his amended complaint, the plaintiff omitted the claims and individual defendants that the undersigned had previously recommended be dismissed and added Elizabeth Masteller, Dr. Ellen Mace, Janet Bunts, and Mark Dibs as defendants. In addition, the plaintiff added a claim pursuant to the Federal Tort Claims Act ("FTCA"). Therefore, on January 3, 2008, the undersigned vacated his original report and recommendation, directed that the Clerk terminate Harrell Watts, Kim M. White, K.L. Wendt, and Joyce Francis as defendants and add Elizabeth Masteller, Dr. Ellen Mace, Janet Bunts, and Mark Dib as defendants.

On January 4, 2008, an Order to Answer was entered directing that a summons be issued for each defendant and noting that the United States should be substituted as the proper defendant for the FTCA claim. On April 16, 2008, the defendant filed a Motion to Dismiss, or in the alternative, Motion for Summary Judgment. On April 17, 2008, a Roseboro Notice was issued, and on June 19, 2008, the plaintiff filed a memorandum of Law in response to that Notice.

## II. The Amended Complaint

In his amended complaint, the plaintiff alleges that his Eighth Amendment Rights were violated through the defendants' deliberate indifference to his medical condition known as Rhabdomyolysis.[1]

---

[1]Rhabdomyolysis is the rapid breakdown of skeletal muscle tissue caused by excessive muscle strain or activity, by extreme physical exercise, by electrolyte and metabolic disturbances, including elevated or reduced blood sodium levels, low potassium levels, low calcium levels, low phosphate levels, diabetes, or abnormally low thyroid function, by the abuse of drugs, including

2

The plaintiff also alleges that the defendants were negligent in their treatment of that condition. The named defendants include Dr. Richard Ramirez, Regional Medical Director, and current or former FCI Gilmer employees: Dr. Ellen Mace Leibson, Clinical Director; Janet Bunts, former Health Services Administrator; Marc Dib, former Physician Assistant; and Elizabeth Masteller Bora, former Physician Assistant and current Assistant Health Services Administrator. The United States of America is the named defendant with respect to the plaintiff's FTCA action. In his Bivens action, the plaintiff seeks compensatory damages in the amount of $500,000 jointly and severally from the individual defendants, as well as $15,000 in exemplary and punitive damages from each of the individual defendants. With respect to his FTCA action, the plaintiff seeks $50,000 in compensatory damages from the United States.

### III. Defendants' Motion to Dismiss or in the Alternative for Summary Judgment

In support of their Motion, the defendants allege that the plaintiff has failed to satisfy the FTCA's administrative exhaustion requirement pursuant to 28 U.S.C. § 2675(a). In addition the defendants argue that the plaintiff failed to comply with West Virginia's Medical Professional Liability Act, and further, that a portion of the plaintiff's FTCA claims are barred by the statute of limitations. Finally, the defendants argue that even if the plaintiff's FTCA action is properly before the Court, said action is subject to dismissal for failure to state a claim upon which relief can be granted. With respect to the plaintiff's Bivens claim, the defendants argue that a portion of the plaintiff's claims are barred as having been filed outside the Statute of Limitations. In addition, the defendants argue that Mark Dib is entitled to absolute immunity, and respondeat superior is not applicable to a Bivens action. The

---

methamphetamine, cocaine, heroin, PCP and Ecstasy, among other various causes. (Doc. 43, pp. 9-10).

defendants also advance the argument that the plaintiff cannot establish supervisory liability and finally that the plaintiff has failed to state a claim of medical negligence under the Eighth Amendment.

## IV. Standard of Review

### A. Motion to Dismiss

In ruling on a motion to dismiss the Court must accept as true all well-pleaded factual allegations. Walker v. True, 399 F.3d 315 (4th Cir. 2005). Furthermore, dismissal for failure to state a claim is properly granted where, assuming the facts alleged in the complaint to be true, and construing the allegations in the light most favorable to the plaintiff, it is clear, as a matter of law, that no relief could be granted under any set of facts that could be proved consistent with the allegations of the complaint. Hishon v. King & Spaulding, 467 U.S. 69, 73 (1984); Conley v. Gibson, 355 U.S. 41, 4506 (1957).

### B. Summary Judgment

Pursuant to Rule 56c of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party." Celotex Corp. V. Catrett, 477 U.S. 317, 322-23 (1986). The court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. Anderson v. liberty lobby, Inc., 477 U.S. 242, 248 *1986).

In Celotex, the Supreme Court held that the moving party bears the initial burden of informing

the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. Celotex at 323. Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Electric Industrial Co. V. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The nonmoving party must present specific facts showing the existence of a genuine issue for trial. Id. This means that the "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson at 256. The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. Id. at 248. To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return a verdict for the [party]." Id. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987). Such evidence must consist of facts which are material, meaning that they create fair doubt rather than encourage mere speculation. Anderson at 248. Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita at 587 (citation omitted).

**V. Analysis**

**A. Federal Tort Claim Act**

The Federal Tort Claims Act (FTCA) is a comprehensive legislative scheme by which the United States has waived its sovereign immunity to allow civil suits for actions arising out of negligent acts of agents of the United States. The United States cannot be sued in a tort action unless it is clear that Congress has waived the government's sovereign immunity and authorized suit under the FTCA. Dalehite v. United

States, 346 U.S. 15, 30-31 (1953). The provisions of the FTCA are found in Title 28 of the United States Code. 28 U.S.C. § 1346(b), § 1402(b), § 2401(b), and §§ 2671-2680.

The Supreme Court has held that "a person can sue under the Federal Tort Claims Act to recover damages from the United States Government for personal injuries sustained during confinement in a federal prison, by reason of the negligence of a government employee." United States v. Muniz, 374 U.S. 150 (1963). However, the FTCA does not create a new cause of action. Medina v. United States. 259 F.3d 220, 223 (4th Cir. 2001). "The statute permits the United States to be held liable in tort in the same respect as a private person would be liable under the law of the place where the act occurred." Id.

Under West Virginia law, certain requirements must be met before a health care provider may be sued. W.Va. Code §55-7B-6. This section provides in pertinent part:

**§ 55-7B-6. Prerequisites for filing an action against a health care provider; procedures; sanctions**

(a) Notwithstanding any other provision of this code, no person may file a medical professional liability action against any health care provider without complying with the provisions of this section.

(b) At least thirty days prior to the filing of a medical professional liability action against a health care provider, the claimant shall serve by certified mail, return receipt requested, a notice of claim on each health care provider the claimant will join in litigation. The notice of claim shall include a statement of the theory or theories of liability upon which a cause of action may be based, and a list of all health care providers and health care facilities to whom notices of claim are being sent, together with a screening certificate of merit. The screening certificate of merit shall be executed under oath by a health care provider qualified as an expert under the West Virginia rules of evidence and shall state with particularity: (1) The expert's familiarity with the applicable standard of care in issue; (2) the expert's qualifications; (3) the expert's opinion as to how the applicable standard of care was breached; and (4) the expert's opinion as to how the breach of the applicable standard of care resulted in injury or death. A separate screening certificate of merit must be provided for each health care provider against whom a claim is asserted. The person signing the screening certificate of merit shall have no financial interest in the underlying claim, but may participate as an expert witness in any judicial proceeding. Nothing in this subsection may be construed to limit the application of rule 15 of the rules of civil procedure.

6

This Court previously held that compliance with W.Va. Code §55-7B-6 is mandatory prior to filing suit in federal court. See Stanley v. United States, 321 F.Supp.2d 805, 806-807 (N.D.W.Va.2004).[2] However, the plaintiff relies on Johnson v. United States, 394 F.Supp.2d 854, 858 (S.D.W.Va. 2005), and argues that he is excused from filing the screening certificate of merit under § 55-7B-6(b) because his claims are "based upon a well-established theory of liability ....[and he] filed a SF-95 administrative claim detailing the facts, specifically setting forth the basis of the alleged legal theory of liability and the damages and injury as a direct and proximate result of the liability." In effect, the plaintiff argues that his case falls within the exception contained in W.Va. Code § 55-7B-6(c) which provides as follows:

> Notwithstanding any provision of this Code, if a claimant or his or her Counsel, believes that no screening certificate of merit is necessary because the cause of action is based upon a well-established legal theory of liability which does not require expert testimony supporting a breach of the applicable standard of care, the claimant or his or her counsel, shall file a statement specifically setting forth the basis of the alleged liability of the health care provider in lieu of a screening certificate of merit.

Although the plaintiff is correct that the court in Johnson held that statements contained in the plaintiff's SF-95 were sufficient to meet the requirements of § 55-7B-6(c), it did so because the plaintiff's theory of liability was based upon a well-established legal theory that did not require an expert to show a breach of the standard of care. Here, however, the medical issues and alleged breaches contained in the complaint "relate to complex matters of diagnosis and treatment that are not within the understanding of lay

---

[2] In Stanley, the plaintiff brought suit against the United States alleging that the United States, acting through its employee healthcare providers, was negligent and deviated from the "standards of medical care" causing him injury. The Court found that there was no conflict between the state pre-filing requirements and the pre-filing requirements of the FTCA. Stanley, 329 F.supp. 2d at 808-09. "[t]here is nothing to prevent a plaintiff from complying with both requirements." Id. at 809.

jurors by resort to common knowledge and experience." O'Neill v. United States of America,, 2008 WL 906470 (S.D.W..Va. March 31, 2008), citing Farley v. Shook, 218 W.Va. 680, 629 S.E.2nd 739, 745 (W.Va. 2006). In other words, the lack of medical care in this case is not as obvious as was the case in Johnson where the doctor "implanted a too large Prostheses backward causing diminished bloodflow and subsequent Necrosis and infections." Johnson at 858. In the instant case, any finding that the plaintiff received medical treatment that fell below the applicable standard of care and caused him injuries must be supported by expert testimony because the diagnosis and treatment of Rhabdomyolysis is not within the understanding of law jurors by resort to common knowledge and experience. Farley at 745. Accordingly, because the plaintiff did not submit a health screening certificate and it has been more than six (6) months since the denial of his administrative tort claim act, his FTCA must be dismissed with prejudice.

## B. Bivens 8th Amendment Claims

To state a claim under the Eighth Amendment, plaintiff must show that defendants acted with deliberate indifference to serious medical needs of a prisoner. Estelle v. Gamble, 429 U.S. 97, 104 (1976). A cognizable claim under the Eighth Amendment is not raised when the allegations reflect a mere disagreement between the inmate and a physician over the inmate's proper medical care, unless exceptional circumstances are alleged. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985).

To succeed on an Eighth Amendment "cruel and unusual punishment" claim, a prisoner must prove two elements: (1) that objectively the deprivation of a basic human need was "sufficiently serious," and (2) that subjectively the prison official acted with a "sufficiently culpable state of mind." Wilson v. Seiter, 501 U.S. 294, 298 (1991). When dealing with claims of inadequate medical attention, the objective component is satisfied by a serious medical condition.

A medical condition is "serious" if "it is diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would recognize the necessity for a doctor's attention."

Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir.1990), *cert. denied*, 500 U.S. 956 (1991); Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3rd Cir.1987) *cert. denied,* 486 U.S. 1006 (1988).[3]

A medical condition is also serious if a delay in treatment causes a life-long handicap or permanent loss. Monmouth 834 F.2d at 347. Thus, while failure to provide recommended elective knee surgery does not violate the Eighth Amendment, Green v. Manning, 692 F.Supp. 283 (S.D. Ala.1987), failure to perform elective surgery on an inmate serving a life sentence would result in permanent denial of medical treatment and would render the inmate's condition irreparable, thus violating the Eighth Amendment. Derrickson v. Keve, 390 F.Supp. 905, 907 (D.Del.1975). Further, prison officials must provide reasonably prompt access to elective surgery. West v. Keve, 541 F. Supp. 534 (D. Del. 1982) (Court found that unreasonable delay occurred when surgery was recommended in October 1974 but did not occur until March 11, 1996.)

The subjective component of a "cruel and unusual punishment" claim is satisfied by showing deliberate indifference by prison officials. Wilson, 501 U.S. at 303. "[D]eliberate indifference entails something more than mere negligence [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer v. Brennan, 511 U.S. 825, 835 (1994). Basically, a prison official "must both be aware of facts from which the inference

---

[3] The following are examples of what does or does not constitute a serious injury. A rotator cuff injury is not a serious medical condition. Webb v. Prison Health Services, 1997 WL 298403 (D. Kansas 1997). A foot condition involving a fracture fragment, bone cyst and degenerative arthritis is not sufficiently serious. Veloz v. New York, 35 F.Supp.2d 305, 312 (S.D.N.Y. 1999). Conversely, a broken jaw is a serious medical condition. Brice v. Virginia Beach Correctional Center, 58 F. 3d 101 (4th Cir. 1995); a detached retina is a serious medical condition. Browning v. Snead, 886 F. Supp. 547 (S.D. W. Va. 1995). And, arthritis is a serious medical condition because the condition causes chronic pain and affects the prisoner's daily activities. Finley v. Trent, 955 F. Supp. 642 (N.D. W.Va. 1997).

9

could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837. A prison official is not liable if he "knew the underlying facts but believed (albeit unsoundly) that the risk to which the fact gave rise was insubstantial or nonexistent." Id. at 844.

Even if this court were to assume that the plaintiff herein suffers from Rhabdomyolysis, and that it constitutes a severe medical condition, the medical records establish that he has received thorough and timely medical treatment for this condition during his incarceration at FCI Gilmer. Therefore, the plaintiff's Eighth Amendment rights clearly have not been violated.

The records reflect that the plaintiff was transferred from FCI Cumberland to FCI Gilmer on May 29, 2003. Upon his arrival at FCI Gilmer, a medical intake screening was completed by Janet Bunts. The plaintiff's only medical complaint upon arriving at FCI Gilmer was that he needed ear wax removed. He denied any acute or chronic pain. On June 11, 2003, the plaintiff reported to the Health Services Department ("HSD"), where his ear was successfully irrigated, and he was prescribed Debrox drops for his ear. (Dckt. 43, p. 1).

On June 23, 2003, the plaintiff reported to the HSD complaining of toe pain and indicated a history of "muscle breakdown" in April of 2002. His foot was examined and no swelling was noted. The possibility of a foot fracture was noted. The plaintiff was prescribed Tylenol as needed for pain. The medical provider questioned whether the plaintiff had a history of Rhabdomyolysis. Blood work and a urinalysis was ordered and civilian medical records were requested. The plaintiff was placed on an athletic restriction, educated on stress fractures, and educated on the side effects of the Tylenol he was provided. (Dckt. 43, p. 2).

On August 26, 2003, the plaintiff was examined and reported that he had problems in 2002 when he was in a county jail and he was working out excessively. He explained that he had to be taken

to the emergency room for nausea, vomiting and severe hematuria. He indicated his CK level in the emergency room was 85,000. He reportedly spent 9 days in the hospital for electrolyte imbalance. The plaintiff indicated that he still worked out at what he considered to be a moderate rate, and that he ran 4-7 miles, 3-5 times per week, as well as performed pushups and dips. He denied any muscle pain or weakness of any kind. He also denied any family history of Rhabdomyolysis. He also denied any muscle injury, heat exposure, seizures, use of drugs, including Statins, electrolyte abnormality, infections, fever, chills, pain, muscle spasms, decrease in range of motion or increase in urine. The medical provider reviewed the labs, including a July 7, 2003 urinalysis that was negative for blood and protein, a July 8, 2003 CMP that showed his Potassium level was 4.3, Sodium level was 142, BUN 15, Creatinine (Cr) 1.10, and a July 25, 2003 CK/CKMM of 740. The provider noted a possible diagnosis of idiopathic Rhabdomyolysis. The plan was to continue to follow his electrolytes and CK and Bun/Cr levels with followup blood work and urinalysis. The plaintiff was placed in the chronic care clinic for general followup every 3-6 months. Repeat labs and urine analysis were scheduled to be completed in 3 months. (Dckt. 43, pp. 2-3).

On February 23, 2004, the plaintiff was seen in the HSD and indicated that he felt tired all the time and had no energy. He indicated that his diet was good, he ate right and he exercised daily, although he noted he had toned down his workouts due to his Rhabdomyolysis. The provider reviewed all the blood work and it showed the CBC with differential and CMP values were all within normal limits. The lab results were explained to the plaintiff. Additional labs were ordered to check the plaintiff's CPK MM, TIBC, Iron and B12 levels. The plaintiff was told to take vitamins and to continue to eat properly. On March 2, 2004, the plaintiff's lab results were reviewed, and he was notified of the results. The lab values had decreased from the previous values. (Dckt. 43, p. 4).

On March 30, 2004, the plaintiff was examined in the HSD. The treating physician noted the

plaintiff's complaints of chronic fatigue for the past year and a past diagnosis of Rhabdomyolysis in 2002. The physician noted the only predisposing factor was weight lifting, which the plaintiff had done since age 17. The physician also noted the plaintiff's complaint of chronic aching of knee and ankle joints, and his complaint that it took a while for his joints to warm up. The plaintiff was continued on his current medications and labs were ordered. On April 16, 2004, the lab results were reviewed by the physician. (Dckt. 43, p. 5).

On December 27, 2007, the plaintiff reported to the HSD complaining of pain in his legs and arms for the past two years. He indicated he was having trouble sleeping and that he had a history of Rhabdomyolysis and chronic fatigue. The plaintiff reported getting up and restless sleeping. He was examined and labs were ordered. He was instructed to return to the clinic in 2 weeks. (Dckt. 43, p. 5).

On January 10, 2005, the plaintiff reported to the HSD complaining of restless sleep and nightmares. He was diagnosed with mild depression and was prescribed Trazadone and was added to chronic care clinic for his depression. (Dckt. 43, p. 5).

On May 23, 2005, the plaintiff was evaluated in the HSD for his reported history of Rhabdomyolysis and chronic back pain. A muscle biopsy was recommended. On June 9, 2005, the plaintiff reported to sick call and was instructed by a contract doctor not to take any medications until the testing was completed. On July 7, 2005, the muscle biopsy was approved by the Utilization Review Committee ("URC"). On August 18, 2005, the plaintiff was evaluated following his complaints of swelling in his left hand for the past 2 ½ weeks. He was evaluated and it was noted that he was awaiting a muscle biopsy. He was provided Tylenol, Prednisone and Nizoral. (Dckt. 4 3, p. 6).

On December 1, 2005, the muscle biopsy was completed. The biopsy showed bundles of skeletal muscle with no degeneration, fiber dropout or inflamation. The plaintiff was seen by Health

12

Services staff as a followup to the muscle biopsy and was provided Motrin. (Dckt. 43, p. 7).

On February 13, 2006, the plaintiff was evaluated in the chronic care clinic. He indicated he had stopped working out. He was evaluated and prescribed Levothyroid (Synthroid) for hypothyroidism. (Dckt. 43, p. 7).

On February 23, 2006, the plaintiff was seen in the HSD to review his labs. It was noted that he had been on Synthroid for 2 weeks with no change in symptoms. He indicated bilateral foot and joint pain when he stood for a long period of time and that it was worse in the mornings. It was noted that he was able to get up and down from the exam table very well with no signs of any pain or problems. It was also noted that his February 2006 labs looked good, his glucose was a 69, and his CK level had decreased to 675. His TH and T4 were within normal range. He was instructed to continue his Synthroid to see if there were any changes. He was also treated for his athletes foot. (Dckt. 43, p. 7).

On April 11, 2006, an administrative note was made in the plaintiff's medical record that he was provided with an article with information about chronic elevated CK levels and muscle breakdown. He was also provided with his lab results. (Dckt. 43, p. 7).

On June 12, 2006, the plaintiff was examined for the swelling in his extremities. He noted he had been exercising and that the exercising increased the swelling. He was evaluated and it was noted his blood pressure was elevated. He was prescribed Lasix for swelling, Clotrimazole Cream and Lidex Ointment for rash. (Dckt. 43, p. 8).

On August 14, 2006, the plaintiff requested different shoes to wear for his visit over the weekend due to the open areas on his feet. The plaintiff was provided a slip honoring his request. The

plaintiff also noted that he was working out, now and then, and that he could run 15–20 minutes, but then his back and feet would hurt. Also on August 14, 2006, a referral to a Rheumatologist was submitted to the URC which approved the referral to an outside specialist on August 22, 2006. (Dckt. 43, p. 8).

On May 10, 2007, the plaintiff was examined by a Rheumatologist in the community. The Rheumatologist found that further rheumatologic evaluation was unnecessary. (Dckt. 43, p. 9).

On June 14, 2006, the plaintiff was evaluated. It was noted he had a Rheumatology consult and that the Rheumatologist had sent back a letter indicating it was not clear what the problem was. All of the lab and muscle biopsy results were to be sent to the Rheumatologist and a request for an EMG and neurology consult would be made. The plaintiff was told that there was a backlog in neurology in the community and that it would be several months before the appointment. The plaintiff was prescribed another round of steroids, specifically a Medrol Dose Pack. He was instructed to continue to drink plenty of water and to continue his normal activities. (Dckt. 43, p. 9).

On September 7, 2007, a followup letter was received from the community Rheumatologist. The letter noted the plaintiff's records had been reviewed and other than a persistently elevated CK level, the work up was negative. (Dckt. 43, p. 10).

In summary, during a nearly five year period at FCI Gilmer, the plaintiff had lab and urine tests completed on July 8, July 25, October 17, 2005, February 3, February 5, February 23, April 1, December 27, December 28, 2004, March 30, May 12, August 18, October 13, 2005, January 24, January 31, February 16, April 11, August 2, August 21, October 16, December 13, 2006, March 5, September 4, 2007, and February 25, 2008. In addition, he had x-rays taken of his foot on June 27, 2003, with no abnormalities noted; of his back on April 29, 2005 with negative findings; of his back

on June 16, 2005, with no vertebral anomaly noted; of his chest on October 4, 2006, with negative results; of his chest on January 9, 2007, with no acute cardiopulmonary pathology noted; and of his chest on February 27, 2007, with no abnormalities noted. He was referred to a Rheumatologist and also had a muscle biopsy completed. Furthermore, in addition to being admitted to the chronic care clinic, he was seen, evaluated, and treated not only as outlined above, but also for a painful lump in his chest, low back pain, injuries following a suspected altercation, a burn to his thumb and finger, an injury to a finger, small lumps in his right armpit, headaches, athletes foot, cellulitis, swelling in his left hand, diarrhea, hemorrhoids, shortness of breath, and a facial twitch. Finally, it is pertinent to note that between May 29, 2003, and February 25, 2008, the plaintiff was seen on a nearly monthly or bimonthly period, and only twice went for more than two months without being seen by HSD.

Therefore, while the plaintiff alleges that he suffers from Rhabdomyolysis,[4] and the medical staff at FCI Gilmer have failed to recognize that his high CK and other levels are continually weakening his muscles and causing extreme pain and suffering, the record before the court clearly establishes that the plaintiff has received continuous and appropriate care for his medical condition. To the extent that the plaintiff has voiced a difference of opinion as to the appropriate treatment for his medical complaints, such a difference of opinion does not rise to the level of an eighth amendment violation. See Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985) (an eighth amendment claim is not raised when the allegations reflect a mere disagreement between an inmate and a physician over the inmate's proper medical care); Meriweather v. Faulkner, 821 F.2d 408, 413 (7th Cir. 1987) (an inmate does not have the

---

[4] Dr. Ellen Mace Liebson, D.O., Clnical Director at FCI Gilmer notes that to have Rhabdomyolysis, "one must have excessive amounts of CPK in their blood, tea colored urine and severe pain and swelling in the muscles, which can lead to significant renal insufficiency and/or kidney failure. Although inmate Moore had on occasion mildly elevated CPK levels, the levels were not high enough to cause him to suffer from Rhabdomyolysis while at FCI Gilmer." (Dckt. 43, p. 10).

right to choose his treatment, and a disagreement with the treatment does not serve to establish that the inmate's medical care was inadequate, or that those treating the inmate acted with deliberate indifference. Furthermore, while the plaintiff may want additional testing or treatment, that fact does not give rise to an Eighth Amendment violation. See Chance v. Armstrong, 143 F.2d 3rd 698, 703 (citing Dean v. Coughlin, 804 F.2d 207, 215 (2nd Cir. 1986) and Estelle 429 U.S. at 106. "The questions whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment." Estelle, 429 U.S. at 107. Finally, ordinary medical malpractice based upon negligence in providing care does not state a claim under the Eighth Amendment. See Estelle, *supra* at 106. ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). Furthermore, the large majority of cases alleging medical Eighth Amendment violations concern the denial of medical care to a prisoner rather than the provision of substandard care; "no care," rather than "bad care." See e.g., Holmes v. Sheahan, 930 F.2d 1196 (7th Cir.), cert. denied, 502 U.S. 960 (1991). Here, even if the plaintiff received "bad care," he did receive care. Accordingly, nothing in the record or in the plaintiff's complaint establishes any facts sufficient to support a finding that the defendants have been deliberately indifferent to his medical needs, and accordingly, the plaintiff's complaint as it relates to his 8th Amendment claims under Bivens should be dismissed for failure to state a claim.

**VI. RECOMMENDATION**

In consideration of the foregoing, it is the undersigned's recommendation that the defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment (Doc. 39) be **GRANTED**; and this case be **DISMISSED PREJUDICE** for failure to state a claim upon which relief can be granted. Any party may file within ten (10) days after being served with a copy of this

Recommendation with the Clerk of the Court written objections identifying the portions of the Recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to the Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Recommendation Failure to timely file objections to the Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Recommendation. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to the *pro se* plaintiff by certified mail, return receipt requested, to his last known address as shown on the docket sheet. The Clerk of the Court is further directed to provide a copy of this Report and Recommendation to all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic Filing in the United States District Court.

DATED: August 20, 2008

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE